IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:11-CV-119-D

| | | |
|---|---|---|
| SHARON DENISE MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM &** |
| | ) | **RECOMMENDATION** |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court upon the parties' cross Motions for Judgment on the Pleadings. (DE's-30 & 32). Plaintiff has filed a response (DE-35), and the time for filing any further responses or replies has expired. Accordingly, the matter is now ripe for adjudication. Pursuant to 28 U.S.C. § 636(b)(1), this matter has been referred to the undersigned for the entry of a Memorandum and Recommendation. (DE-34). For the following reasons, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings (DE-30) be DENIED, that Defendant's Motion for Judgment on the Pleadings (DE-32) be GRANTED, and that the final decision by Defendant be AFFIRMED.

**Statement of the Case**

Plaintiff applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on October 30, 2007 alleging that she became unable to work on February 23, 2007. (Tr. 35). This application was denied initially and upon reconsideration. *Id.* A hearing

1

was held before an Administrative Law Judge ("ALJ"), who determined that Plaintiff was not disabled during the relevant time period in a decision dated June 9, 2010. *Id.* at 35-46. The Social Security Administration's Office of Hearings and Appeals ("Appeals Council") denied Plaintiff's request for review on April 29, 2011, rendering the ALJ's determination as Defendant's final decision. *Id.* at 1-6. Plaintiff filed the instant action on June 10, 2011. (DE-1).

## Standard of Review

This Court is authorized to review Defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...

> 42 U.S.C. § 405(g).

"Under the Social Security Act, [the Court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is ... such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). "In reviewing for substantial evidence, . . . [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute . . . [its] judgment for that of the Secretary." Craig, 76 F.3d at 589. Thus, this Court's review is limited to determining whether Defendant's finding that Plaintiff was not disabled is "supported by

2

substantial evidence and whether the correct law was applied." <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

## <u>Analysis</u>

The Social Security Administration has promulgated the following regulations which establish a sequential evaluation process that must be followed to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).
>
> <u>Mastro v. Apfel</u>, 270 F.3d 171, 177 (4th Cir. 2001).

In the instant action, the ALJ employed the sequential evaluation. First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date. (Tr. 37). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: 1) obesity; 2) cervical spine problems; and 3) asthma. *Id.* However, the ALJ determined that these impairments were not severe enough to meet or medically equal one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. *Id.* at 39-40. Based on the medical record, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform unskilled sedentary work with certain exceptions. *Id.* at 40.

The ALJ then determined that Plaintiff was unable to perform any past relevant work. *Id.* at 44. However, based on the testimony of a vocational expert ("VE"), the ALJ determined that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform. *Id.* at 44-45. Accordingly, the ALJ determined that Plaintiff was not under a disability at any time through the date of his decision. *Id.* at 45. These determinations were supported by substantial evidence, a summary of which now follows.

On April 4, 2006, Plaintiff reported to New Hanover Regional Medical Center ("NHRMC"), complaining of chest pain and shortness of breath. *Id.* at 279. A review of her systems was otherwise unremarkable. *Id.* It was noted that Plaintiff had a history of: 1) obstructive sleep apnea; 2) asthma; and 3) morbid obesity. *Id.* Plaintiff was working at Wal-Mart as a customer manager at this time. *Id.* A myocardial perfusion study was slightly limited due to Plaintiff's obesity. *Id.* at 287. However, the study revealed "no evidence for reversible or irreversible perfusion abnormalities throughout to suggest ischemia or infarct." *Id.* Wall motion analysis was normal. *Id.*

An MRI taken March 1, 2007 showed a "normal cervical spine." *Id.* at 315.

Plaintiff received was treated at NHRMC again on March 23, 2007 due to complaints of tingling and numbness in her right arm and thigh. *Id.* at 288. A MRI of Plaintiff's brain was normal and "all her lab work was within normal limits." *Id.* Likewise, a chest x-ray was unremarkable. *Id.* Upon discharge, Plaintiff was described as "neurologically stable." *Id.* She was diagnosed with: 1) paresthesia; 2) right sided neck pain; 3) sleep apnea; 4) hypertension; 5) obesity; and 6) asthma. *Id.* at 289. It was also noted that Plaintiff had "negative neurological work up" and "negative cardiac work up." *Id.* at 289.

A March 30, 2007 MRI of Plaintiff's cervical spine revealed right sided disc herniation, but

4

no myelomalacic change or cervical cord abnormalities. *Id.* at 316.

Stephen Free, a physician's assistant, examined Plaintiff on April 13, 2007. *Id.* at 366-367. Plaintiff complained of right sided neck pain which had persisted for about six weeks "without a history of injury". *Id.* at 366. Pain medicine and physical therapy helped her symptoms. *Id.* She had a normal steady gait without a limp and a good range of motion of the cervical spine. *Id.* Her upper extremity strength, sensation and reflexes were intact. *Id.* Ultimately, Mr. Free concluded that the results of Plaintiff's orthopedic examination were "normal." *Id.*

Plaintiff had no gross weakness on April 24, 2007, but her "symptoms [were] consistent with a right C7 radiculopathy which has been present for two months." *Id.* at 368. Surgical management was recommended. *Id.* However, Plaintiff wanted "to try something else and physical therapy" was arranged. *Id.* It was recommended that Plaintiff stay out of work until her therapy was completed. *Id.*

On April 30, 2007, it was noted that Plaintiff was experiencing neck pain for "no apparent reason." *Id.* at 369. Her gait was normal, and she listed "roller skating" as an avocation. *Id.* She also noted she could tolerate household chores and computer work for approximately 30 minutes at a time. *Id.* Plaintiff demonstrated only minimal loss of her cervical range of motion. *Id.* at 370. It was determined that Plaintiff's potential for rehabilitation was "good." *Id.*

Dr. Christopher Barber examined Plaintiff on May 1, 2007. *Id.* at 310-314. Upon examination, Plaintiff's lungs were clear with no wheezes. *Id.* at 311. She was assessed with, *inter alia*: 1) hypertension; 2) cervical disk disease; 3 dyslipidemia; and 4) exogenous obesity. *Id.* at 312. Testing results were normal, and "suggest[ed] a relatively low probability of angiographically significant coronary artery disease." *Id.* at 310. Dr. Barber did not believe

5

Plaintiff required pharmacotherapy, and recommended only that she reduce her intake of caffeine and other stimulants. *Id.* at 312.

Plaintiff participated in physical therapy at Atlantic Orthopedics from May 4, 2007, to June 22, 2007. *Id.* at 372-388. Christine Kinney, Plaintiff's physical therapist, consistently noted that Plaintiff reported "decreased pain" after her treatment sessions. *Id.* at 372, 375, 376, 378, 380, 381, 383, 384, 386. It was noted on May 4, 2007 that Plaintiff's right hand tingling was improving. *Id.* at 372-373. Ms. Kinney noted that Plaintiff had "increased endurance" on May 11, 2007. *Id.* at 376. During a May 18, 2007 examination Plaintiff had no weakness or myelopathy. *Id.* at 379. On May 22, 2007, Plaintiff reported that she had "no pain in [her] neck or right arm after [manual therapy]". *Id.* at 380. Increased ability to reach was also noted. *Id.* at 380-381. Dr. Mark Rodger stated that Plaintiff had "improved again" on May 29, 2007. *Id.* at 382. Examination failed to reveal any myelopathy and she had no weakness in the C7 root. *Id.* Her "pain in the right . . . [was] much improved." *Id.* Dr. Rodger recommended that Plaintiff continue physical therapy, and not return to work. *Id.* However, Dr. Rodger recommended that Plaintiff reconsider her treatment options in one month. *Id.* After treatment sessions on June 5 and June 6, 2007, Plaintiff stated that she had no pain. *Id.* at 383-384. Likewise, Ms. Kinney noted that Plaintiff had an "increased ability to work." *Id.* at 383.

On June 29, 2007, Plaintiff was examined by Dr. Rodger. *Id.* at 389. Plaintiff had pain down her right arm, as well as back pain with radiation of pain in her right leg. *Id.* However, Plaintiff had no obvious neurologic deficit or myelopathy findings on examination. *Id.* Her symptoms were described as "unmanageable." *Id.* Dr. Rodger increased Plaintiff's pain medication. *Id.* Ultimately, Dr. Rodger opined that Plaintiff was "[s]till unable to return to work." *Id.*

6

Dr. Jillian Maguire discharged Plaintiff from physical therapy on July 2, 2007 due to Plaintiff's non-compliance and inconsistent attendance. *Id.* at 511.

A July 16, 2007 MRI of Plaintiff's cervical spine was unremarkable. *Id*. at 318. The MRI showed "a moderate decrease in the size of the previously described right sided disc herniation . . . compared to [her] March, 2007 exam". *Id.* A lumbar spine MRI showed "[m]ild disc bulging to the left without a definite disc herniation evident." *Id.* at 320. Her bone marrow signal was within normal limits, and there was no central or lateral recess stenosis. *Id.*

Plaintiff received epidural steroid injections on August 6, 2007. *Id.* at 393-394. Dr. Francis Pecoraro described Plaintiff's cervical spine problems as "nonsurgical." *Id.* at 394. The injections were repeated on September 5, 2007. *Id.* at 395. No complications were experienced during either procedure. *Id.* at 393-396. Prior to the September 5, 2007 procedure, Dr. Pecoraro noted that Plaintiff had been diagnosed with: 1) C6-7 disk herniation; and 2) right upper limb cervical radiculopathy. *Id.* at 395. After the September 5, 2007 procedure, Plaintiff could clearly stand and maintain a stance without difficulty. *Id.* at 396. Finally, Plaintiff's pain medication was refilled. *Id.*

On September 27, 2007, Plaintiff was examined by Dr. Rodger. *Id.* at 330. The epidural steroid injections were described as having "little effect.." *Id.* Specifically, Plaintiff continued to be symptomatic with pain in both the leg and arm. *Id.* However, a MRI of the lumbar spine showed no abnormalities. *Id.* In addition, Plaintiff also complained of "dysfunction in her cauda equine with numbness and tingling and some problems with urinary function although no incontinence." *Id.* at 330. Ultimately, Dr. Rodger opined that these symptoms were not consistent with MRI findings. *Id.* He also indicated that Plaintiff's symptoms "suggest[ed] no clear compressive pathology to explain her symptoms." *Id.* Plaintiff was advised to consult a

7

neurologist. *Id.*

Jill Billups, a physician's assistant, examined Plaintiff on November 28, 2007. *Id.* at 509. Plaintiff complained of pain in the right shoulder and leg, and tenderness to the right hip following a fall. *Id.* Ms. Billups increased Plaintiff's dosage of pain medications. *Id.*

Thomas Dixon, a consultant for the North Carolina Department of Health and Human Services' Disability Determination Services, assessed Plaintiff's physical RFC on November 29, 2007. *Id.* at 399-406. He determined that Plaintiff could: 1) occasionally lift and/or carry 50 pounds; 2) frequently lift and/or carry 25 pounds; 3) stand and/or walk (with normal breaks) about six hours in an eight hour workday; 4) sit with normal breaks) about six hours in an eight hour workday; and 5) push and/or pull with no limitations other than those already noted for lifting and carrying. *Id.* at 400. No postural, manipulative, visual, communicative, or environmental limitations were noted. *Id.* at 401-403. Ultimately, Mr. Dixon concluded that Plaintiff retained the ability to perform work at the medium exertional level. *Id.* at 406.

Dr. Giuliana Gage performed a psychiatric review technique on December 3, 2007. *Id.* at 407-420. She determined that Plaintiff's mental impairments were not severe. *Id.* at 407. Likewise, it was determined that Plaintiff's depression and anxiety did not precisely satisfy the diagnostic criteria of a listed impairment. *Id.* at 410, 412. Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. *Id.* at 417. After reviewing the medical record, Dr. Gage noted that Plaintiff's depression was controlled with medication and was not debilitating. *Id.* at 419. Likewise, Plaintiff was not undergoing mental health treatment, nor did she intend to seek any. *Id.* Ultimately, Dr. Gage determined that Plaintiff, if not for her pain and physical condition, would be able to work. *Id.*

8

Dr. David Bachman examined Plaintiff on January 9, 2008. *Id.* at 435-436. He described Plaintiff's condition as a "[v]ery difficult case with multiple issues." *Id.* at 435. Plaintiff complained of: 1) right hemisensory deficit of unknown etiology; 2) chronic neck pain; and 3) her right leg "giving out on her inexplicably." *Id.* Dr. Bachman stated that physical therapy slightly improved Plaintiff's neck pain. *Id.* Regarding Plaintiff's right leg problems, Dr. Bachman stated that "the MRI does not show much." *Id.* Plaintiff's gait was slow and labored, although Dr. Bachman believed it was more "'cautious' than ataxic." *Id.*

A January 12, 2008 MRI of Plaintiff's brain was essentially normal, although a very mild degree of "scattered bihemispheric punctuate T2 signal abnormality" was noted. *Id.* at 447.

Plaintiff returned to Atlantic Orthopedics for follow up on February 1, 2008. *Id.* at 423. She stated that her pain medications were helping "a lot" and were keeping her pain stable. *Id.* However, Plaintiff still complained of pain in her right shoulder and leg. *Id.* Plaintiff was walking with a cane because her leg "gives out on her intermittently." *Id.* Her gait was mildly antalgic with the can, and Plaintiff was in no apparent distress. *Id.*

On February 11, 2008, Plaintiff underwent a nerve conduction study. *Id.* at 432. Plaintiff's symptoms were described as "very nonspecific." *Id.* Upon examination, Plaintiff was able to move her upper and lower extremities against gravity and resistance. *Id.* The results of the nerve conduction study were essentially normal and there was no evidence of neuropathy. *Id.*

A May 9, 2008 MRI of Plaintiff's cervical spine revealed a large right posterior lateral disc protrusion and tearing at the C6-7 vertebrae. *Id.* at 507.

Plaintiff was examined by Ms. Billups on May 19, 2008. *Id.* at 504. She stated that her pain was becoming worse and that her pain medication was helping "only a little." *Id.* In addition, Plaintiff indicated that she was considering surgery. *Id.* Upon examination, Plaintiff

9

was in no apparent distress. *Id.* However, Plaintiff did have decreased cervical range of motion and tenderness to palpation. *Id.* She also had muscle spasm in her posterior cervical area. *Id.* Plaintiff's gait was antalgic with a cane. *Id.* Ms. Billups recommended an increase in Plaintiff's pain medication. *Id.* at 505.

A myocardial perfusion study performed on June 9, 2008 revealed normal results, and no evidence of cardiovascular problems. *Id.* at 456-458

Dr. Bertron Haywood assessed Plaintiff's physical RFC on July 22, 2008. *Id.* at 459-466. It was determined that Plaintiff could: 1) occasionally lift and/or carry 20 pounds; 2) frequently lift and/or carry 10 pounds; 3) stand and/or walk (with normal breaks) for a total of about six hours in an eight hour workday; 4) sit (with normal breaks) for a total of about six hours in an eight hour workday; and 5) push and/or pull with no limitations other than those already noted for lifting and carrying. *Id.* at 460. No postural, visual, communicative, or environmental limitations were noted. *Id.* at 461-463. Plaintiff had no manipulative limitations other than being limited in her reaching in all directions. *Id.* at 462. Based on these findings, Dr. Haywood opined that Plaintiff "should be capable of light exertion with occasional overhead reaching" *Id.* at 466. Finally, Dr. Haywood opined that Plaintiff's "allegations were not fully credible based on the evidence in the file." *Id.*

Dr. Gloria Edmunds performed a psychiatric review technique on July 22, 2008. *Id.* at 467-480. She determined that Plaintiff's mental impairments were not severe. *Id.* at 467. She also determined that Plaintiff's depression and anxiety did not precisely satisfy the diagnostic criteria for any listed impairment. *Id.* at 470, 472. Dr. Edmunds determined that Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. *Id*. at 477.

10

On July 28, 2008, Plaintiff underwent an anterior cervical diskectomy and fusion of her cervical spine. *Id.* at 481-488. Dr. Rodger noted that Plaintiff had radiological evidence of disc herniation at her right C6-7 vertebrae, "without any obvious other abnormalities." *Id.* at 487. During the surgery, Dr. Rodger decompressed Plaintiff's cervical discs to relieve pain. *Id.* at 488. Dr. Rodger noted that Plaintiff "did well orthopedically and had no significant complications" as a result of the surgery. *Id.* at 481. Plaintiff was discharged "in improved and stable condition" on July 29, 2008. *Id.*

Dr. Rodger examined Plaintiff on August 12, 2008. *Id.* at 499-500. Her arm pain had improved and x-rays showed normal alignment. *Id.* at 499. It was recommended that Plaintiff not work. *Id.*

Plaintiff reported to the emergency room on December 22, 2008, after a motor vehicle accident. *Id.* at 494-495. Radiological scans of Plaintiff's neck and back showed evidence of her surgery with no complications, but were otherwise normal. *Id.* at 492-493.

On January 27, 2009, Dr. Rodger examined Plaintiff, noting that she had returned "after a prolonged absence". *Id.* at 498. X-rays of her cervical spine were "satisfactory." *Id.* Plaintiff stated that her symptoms had improved after surgery, although she still had some right arm pain. *Id.* In addition, Plaintiff indicated that she was experiencing more neck, back, arm and leg pain after her motor vehicle accident. *Id.* No definitive neurologic deficit was noted on examination. *Id.* Dr. Rodger recommended pain management as treatment. *Id.*

On June 19, 2009, Dr. Pecoraro completed a form entitled "Social Security Statement of Employability." *Id.* at 496. On the form, Dr. Pecoraro indicates that Plaintiff could not perform sedentary work on a regular basis. *Id.* When asked why not, Dr. Pecoraro wrote, "Cervical & Lumbar Radiculopathy." *Id.* Dr. Pecoraro indicated his conclusion was based on a reasonable

11

degree of medical probability. *Id*.

Plaintiff testified that she became injured in 2007, when she ruptured a disk in her neck. *Id*. at 58. She testified that her "excruciating pain increasing has stopped" but she still has pain. *Id*. Furthermore, Plaintiff testified that a motor vehicle accident in December 2008 caused "another bulge" in her neck, which affected her left side. *Id*. She reported that symptoms on her left side had since decreased, but "they still come back." *Id*. at 59. However, she was not in constant pain on her left side. *Id*. Later, Plaintiff indicated that her "worst problem" was constant pain in her right arm, neck and leg. *Id*. at 61. This pain is a constant aching, and she stated that using her arms in any way worsens the pain. *Id*. at 62. The pain makes sleeping difficult for her. *Id*. Pain management treatment eases her pain, but does not completely eliminate it. *Id*. at 63. Because of her pain, Plaintiff is "irritable and agitated very easily." *Id*. at 63. In addition, Plaintiff noted that she has crying spells. *Id*. at 64. Plaintiff did not think medicine was helping her depression. *Id*. at 64. She further testified that she was generally unable to drive. *Id*. at 63-64. Likewise, on a normal day Plaintiff indicated that she does little more than "stay around the house and stay comfortable." *Id*. at 64. According to Plaintiff she spends the majority of the day laying down. *Id*. at 64. She also testified she required a cane to walk. *Id*. at 65. Plaintiff testified that she could not go to grocery store for even an hour, because doing so would cause her to have to sleep the whole next day. *Id*. at 66. Similarly, Plaintiff indicated she no longer attended church because of her pain. *Id*. at 67. She testified that she could not wash dishes, do laundry, or attend to chores. *Id*. at 67-68.

The VE in this matter testified that a person with Plaintiff's RFC could perform jobs which exist in significant numbers in the national economy. *Id*. at 69-73.

Based on this record, the ALJ made the following specific findings in addition to those

previously noted:

> The claimant suffers from obesity, which is a severe impairment. Medical records document the claimant's obesity. (Exhibits 5F, 15F, 18F). The claimant is 62 inches tall and has fluctuated between 289 and 307 pounds per the medical records. (Exhibits 15F, 18F). The undersigned has evaluated this impairment according to the requirements of Social Security Ruling 02-1 p, as required. The medical evidence confirms that the claimant has a body mass index (BMI) of greater than 35, which represents "extreme" obesity. According to the National Institutes of Health (NIH), it is individuals of "extreme" obesity, as defined above, who suffer the greatest risk of developing obesity-related impairments.

> The medical evidence of record adequately establishes that the claimant has suffered from cervical spine problems, which constitute a severe impairment. The claimant's cervical spine problems have included the following diagnoses: bulging disc and disc herniation at C6-7, cervical radiculopathy, cervicalgia, radiculopathy, and sciatica. (Exhibit 20F). She has taken narcotic pain medication and had cervical steroid injections. (Exhibits 8F, 20F). She has experienced decreased cervical range of motion and tenderness to palpation and muscle spasm in her posterior cervical area. On May 16, 2008, Dr. Rodger noted significant disc herniation at C67 and recommended the claimant undergo a cervical fusion. (Exhibit 20F). On July 28, 2008, the claimant underwent a fusion at C6-7. (Exhibit 18F).

> The medical evidence sufficiently establishes through diagnoses that the claimant suffers from asthma, which is a severe impairment. The claimant has experienced daily symptoms from her asthma, which has been medically diagnosed. The claimant has chronic shortness of breath and uses albuterol via a nebulizer or a metered dose inhaler several times a day. (Exhibit 18F 7/28/08).

> The claimant's medically determinable impairment of right arm pain does not cause more than minimal limitation in the claimant's ability to perform basic work activities and is, therefore, non-severe. She has seen a neurologist and an orthopaedist regarding her arm pain. Her neurologist provided no specific diagnosis, nor did she show any obvious myelopathy or any evidence of neuropathy. (Exhibits 14F, 20F). She has been diagnosed with right upper extremity radiculopathy. At an examination with Dr. Rodger on August 12, 2008, the claimant reported that her arm pain was better than it was before surgery. (Exhibit 20F).

> The claimant's medically determinable impairment of right leg problems does not cause more than minimal limitation in the claimant's ability to perform basic work activities and is, therefore, non-severe. Despite her

13

consistent complaints of leg problems, the medical evidence contains no indication that any physician has been able to determine a cause for the claimant's alleged symptoms despite multiple examinations and imaging studies. Her gait is antalgic with a cane, but she has good and equal strength of both legs. (Exhibit 20F). She has reported that her right leg gives out on her, but no explanation has been found. David Bachman, M.D., the claimant's neurologist has described her leg condition as "inexplicable" and noted that MRIs of the lumbar spine and brain and an EEG have offered no explanation. (Exhibit 14F).

The claimant's medically determinable mental impairments of depression and anxiety, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore non-severe. Medical records show that the claimant has been prescribed Xanax and Lexapro. (Exhibits 13F, 15F, 18F). Treatment notes from June 27, 2009 show that the claimant's depression had improved with Lexapro. (Exhibit 15F). All of the claimant's treatment for her mental impairments has been rendered by a general practitioner, and she has never sought psychiatric treatment or treatment from a specialist. In making this finding, the undersigned has considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C ofthe Listing of Impairments (20 C.F.R., Part 404, Subpart P, Appendix 1). These four broad functional areas are known as the "paragraph B" criteria . . .

The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 . . .

The undersigned has specifically considered whether the claimant's cervical spine problems meet Listing 1.02 of the Listing of Impairments. The undersigned finds that it does not meet the listing as it has not resulted in an inability to ambulate or perform fine and gross movements effectively.

The undersigned has specifically considered whether the claimant's asthma meets Listing 3.03 of the Listing of Impairments. The undersigned finds that it does not meet the listing as it has not resulted in chronic asthmatic bronchitis or attacks (as defined in 20 C.F.R., Part 404, Subpart P, Appendix I, Section 3.00(C)) in spite of prescribed treatment and requiring physician intervention and occurring at least once every 2 months or at least 6 times a year.

 . . . After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except that the

14

claimant must have the option to sit or stand at will; can never climb ropes, ladders, or scaffolds; is limited to no constant use of the left upper extremity and only occasional overhead reaching; and must avoid hazards, fumes, odors, and gases. Additionally, the claimant is limited to unskilled work . . .

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment. She said she walks with a prescribed cane because her right leg sometimes gives out.

In terms of the claimant's alleged obesity, after a thorough review of the evidence of record, the undersigned finds that the claimant's obesity has not had a negative effect upon the claimant's ability to perform routine movement beyond the residual functional capacity stated above or upon her ability to sustain function over an 8-hour day.

In terms of the claimant's alleged cervical spine problems, the undersigned finds that they have been improved with surgery such that they do not have a negative effect on the claimant's ability to perform work-related activity beyond the residual functional capacity stated above . . .

Despite her complaints of such significant functional limitations and pain, the evidence reveals that the claimant has been frequently non-compliant with her treatment regimen, which suggests that the symptoms may not have been as limiting as the claimant has alleged. A claimant's failure to follow prescribed treatment without a good reason is grounds to find the claimant not disabled. (20 C.F.R. § 404.1530). Records from Ben Akiwumi, M.D., the claimant's general practitioner, have described her as "non-compliant" on more than one occasion . . .

Given the claimant's allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on the claimant by the treating doctor. A review of the records in this case reveals no restrictions recommended by the treating physician.

As mentioned earlier, the record reflects work activity after the alleged onset date. Although that work activity did not constitute disqualifying substantial gainful activity, it does indicate that the claimant's daily activities have, at least at times, been somewhat greater than the claimant has generally reported . . .

The undersigned has specifically considered the opinion of Francis

Salvatore Pecoraro, M.D., the claimant's treating orthopaedist, who stated on June 19,2009, that the claimant is unable to work as a result of her cervical and lumbar radiculopathy. (Exhibit 20F). The undersigned accords little weight to this opinion as it is inconsistent with the weight of the medical evidence of record.

The undersigned has specifically considered the opinion of the State agency medical consultants who conducted residual functional capacity assessments of the claimant. (Exhibits 9F, 16F). Although these consultants found that the claimant was not disabled, they failed to adequately consider the combined effects of all of the claimant's impairments, which resulted in a finding that the claimant had a greater residual functional capacity than can be justified by the medical evidence of record. While the undersigned agrees with their determinations that the claimant is not precluded from all work activity, the undersigned accords only some weight to these opinions.

The undersigned has considered the opinions of the State agency psychiatric consultants and accords these opinions considerable weight. These consultants recognized the claimant's anxiety and depression and found them to be non-severe, which is consistent with the medical evidence of record. (See Exhibits 10F, 17F) . . .

The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as telephone order clerk (209.567-014, approximately 450 in North Carolina and 19,000 nationally) and charge account clerk (205.367-014, approximately 440 in North Carolina and 15,000 nationwide). Both of these representative occupations are sedentary with an SVP of 2 . . .

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

*Id.* at 38-45.

Finally, Plaintiff submitted additional evidence to the Appeals Council after the ALJ entered his decision. This evidence was considered by the Appeals Council before it denied Plaintiff's request for review. *Id.* at 4. Plaintiff's supplemental evidence shall now be

16

summarized.

On September 29, 2009, Dr. Pecoraro filled out a form assessing Plaintiff's functional capabilities. *Id*. at 592. Dr. Pecoraro found that Plaintiff could sit for two hours at a time, and for six hours in a day; and could stand or walk for fifteen minutes at a time, and for two to three hours in a day. *Id*. He concluded Plaintiff could frequently carry ten pounds, and occasionally carry 20 pounds. *Id*. Furthermore, he opined that Plaintiff could occasionally bend, kneel and crouch, and had no limitations in driving. *Id*. Plaintiff was deemed able to occasionally reach above the shoulder and below the waist level, and frequently lift at the waist level. *Id*. When asked whether Plaintiff had a psychiatric or cognitive impairment, Dr. Pecoraro checked "yes." *Id*. However, he described this "psychiatric/cognitive impairment" as: "poor sitting, standing, and walking." *Id*. Dr. Pecoraro opined that Plaintiff was "[t]otally disabled." *Id*.

Tyler Whiteside, a physical therapist, performed a functional capacity evaluation of Plaintiff, and submitted a report on September 7, 2010. *Id*. at 517-525. After performing a physical examination and administering several strength tests, Mr. Whiteside concluded that Plaintiff had the physical capability to generally lift 15 pounds, and to lift five pounds overhead; to carry five pounds; single-hand carry five pounds; and push and pull 40 pounds. *Id*. at 524. Mr. Whiteside noted that these capabilities ranged from the sedentary to the medium levels of exertion. *Id*. Likewise, Mr. Whiteside noted that Plaintiff was able to complete the minimal functional capacity requirements for sitting, standing, kneeling, and reaching. *Id*. at 524-525.

Dr. Dixon Pearsall submitted a "Vocational and Work Capacity Opinion" based primarily on Mr. Whiteside's report *Id*. at 527-530. He did not personally examine Plaintiff, nor did he review the entire medical record. *Id*. at 527. Based on this very limited review, Dr. Pearsall concluded that Plaintiff's RFC was "less than sedentary" and that Plaintiff "does not retain the

[RFC] to work competitively at any exertion or skill level.  *Id.* at 530.

Likewise, Dr. Pecoraro commented on Mr. Whiteside's evaluation.  *Id.* at 590.  After reviewing this evaluation, Dr. Pecoraro stated that Plaintiff "is capable of modified sedentary work . . ."  *Id.* at 590.

The Court hereby finds that there was substantial evidence to support each of the ALJ's conclusions.  Moreover, the ALJ properly considered all relevant evidence, including the evidence favorable to Plaintiff, weighed conflicting evidence, and fully explained the factual basis for his resolutions of conflicts in the evidence.  Plaintiff's argument relies primarily on the contention that the ALJ improperly weighed the evidence.  However, this Court must uphold Defendant's final decision if it is supported by substantial evidence.  Although Plaintiff may disagree with the determinations made by the ALJ after weighing the relevant factors, the role of this Court is not to undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Secretary.  Craig, 76 F.3d at 589.  Because that is what Plaintiff requests this Court do, her claims are without merit.  The undersigned will nonetheless address portions of Plaintiff's specific assignment of error.

**The ALJ proper evaluated the opinions of treating and examining medical professionals**

Plaintiff argues that the ALJ "committed reversible error by failing to accept medical opinions of functional restrictions of treating and examining medical professionals."  (DE-31, pg. 10).  The undersigned disagrees.

It is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein.  Wireman v. Barnhart, 2006 WL 2565245, * 8 (W.D.Va. September 5, 2006)(internal citations omitted).  Furthermore, "while an ALJ may not reject medical evidence for no reason or the wrong reason . . .an ALJ may, under the

18

regulations, assign no or little weight to a medical opinion, even one from a treating source . . . if he sufficiently explains his rationale and if the record supports his findings." *Id.* (internal citations omitted). While "the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). Rather, "a treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Mastro, 270 F.3d at 178. Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590. In sum, "an ALJ's determination as to the weight to be assigned to a medical opinion will generally not be disturbed absent some indication that the ALJ has dredged up specious inconsistencies or has not given good reason for the weight afforded a particular opinion." Koonce v. Apfel, 166 F.3d 1209, * 2 (4th Cir. 1999) (unpublished opinion)(internal citations omitted).

In his decision, the ALJ fully explained his reasoning in weighing the medical evidence. These reasons were supported by substantial evidence and, therefore, this assignment of error is without merit.

**The ALJ properly assessed Plaintiff's RFC and presented a proper hypothetical to the VE**

Plaintiff next contends that the ALJ presented an improper hypothetical to the VE prior to the VE's testimony. An ALJ has great latitude in posing hypothetical questions to a VE and is free to accept or reject suggested restrictions so long as there is substantial evidence to support the ultimate question. The ALJ is required only to "pose those [hypothetical questions] that are based

on substantial evidence and accurately reflect the plaintiff's limitations . . ." <u>France v. Apfel</u>, 87 F. Supp. 2d 484, 490 (D. Md. March 13, 2000). Here, the hypothetical question posed to the VE by the ALJ was based on a RFC determination supported by substantial evidence and therefore accurately reflected all of Plaintiff's limitations. This assignment of error is without merit.

**<u>Plaintiff's Appeals Council evidence does not alter the analysis</u>**

Finally, Plaintiff argues that she submitted additional evidence to the Appeals Council which undermines the ALJ's determination. When the Appeals Council incorporates new evidence into the administrative record, the reviewing court considers the record as a whole, including the new evidence, to determine whether the Commissioner's decision is supported by substantial evidence. <u>Wilkins v. Sec'y of Health & Human Servs.</u>, 953 F.2d 93, 96 (4th 1991). Generally, the Appeals Council is not required to articulate a detailed assessment of any additional evidence submitted by a claimant. <u>Freeman v. Halter</u>, 15 Fed. Appx. 87 (4th Cir. 2001)(unpublished); <u>Hollar v. Commissioner of Social Sec. Admin.</u>, 194 F.3d 1304 (4th Cir. 1999)(unpublished). The undersigned has already summarized the evidenced presented by Plaintiff to the Appeals Council, and finds that the ALJ's findings are supported by substantial evidence even after this additional evidence is considered. Indeed, Dr. Pecoraro determined that Plaintiff was capable of performing the demands of a reduced range of sedentary work—a finding that is consistent with the ALJ's RFC determination. (Tr. 40-44, 592). This assignment of error is without merit.

**Conclusion**

For the aforementioned reasons, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings (DE-30) be DENIED, that Defendant's Motion for Judgment on the Pleadings (DE-32) be GRANTED, and that the final decision by Defendant be AFFIRMED.

SO RECOMMENDED in Chambers at Raleigh, North Carolina on Tuesday, February 14, 2012.

_____

WILLIAM A. WEBB
UNITED STATES MAGISTRATE JUDGE